STATE of Wisconsin, Plaintiff-Respondent,

v.

Gordana LEPRICH, Defendant-Appellant.†

Court of Appeals

*No. 90–0539–CR. Submitted on briefs September 7, 1990.—Decided January 31, 1991.*

(Also reported in 465 N.W.2d 844.)

† Petition to review denied.

473

For the defendant-appellant the cause was submitted on the briefs of *Robert P. VanDeHey* of *Hoskins, Brown, Kalnins, McNamara & VanDeHey* of Lancaster.

For the plaintiff-respondent the cause was submitted on the brief of *Anthony J. Pozorski,* assistant district attorney.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

DYKMAN, J. Defendant Gordana Leprich appeals from a trial court order denying a motion to suppress her statements and from a judgment convicting her of disorderly conduct. Because we conclude the statements admitted by the trial court were in response to general on-the-scene police questioning, we affirm.[1]

## BACKGROUND

The only witness called at the suppression hearing was Grant County Deputy Sheriff Robert Bloyer. Bloyer testified that on October 9, 1989, he was dispatched to a domestic dispute at the trailer home of defendant and her husband, John Leprich. He stated that when he arrived, a police officer had already removed John from the trailer home. John informed Bloyer that defendant had been angry with him and thrown a stereo speaker, hitting him on the arm and leaving a black and blue mark.

Bloyer then went inside the trailer home to speak with defendant. He recounted their conversation as follows:

---

[1]This case was assigned to a three-judge panel upon this court's own motion. *See* Sec. 809.41(2), Stats.

474

A. [Defendant] told me that John was on the telephone, she was watching their son . . . supper was being prepared on the stove and it was all getting done about the same time and John was not helping, he was still on the phone, and she got angry.

Q. Then what happened?

A. She said that John came to the table. She asked him to fix something for their son, but he started fixing something else, so she got something for their son. She slammed it on the stove or the table and John had said something, [which] I believe she said was, "go ahead and break it" . . .. At this point, she said she was angry enough and picked up the stereo speaker and threw it at him.

Defendant told Bloyer that the speaker had hit John and that John had thrown it back, hitting defendant in the ear. She showed Bloyer the injury. She told Bloyer that these types of incidents had occurred before, and that she felt they were her fault.

Bloyer testified that he noticed broken furnishings and food were scattered about the trailer home. He stated that he asked defendant whether, if arrested, she was comfortable leaving their child with John. She responded that she was. Bloyer then informed John and defendant that he was going to charge them both, but would only take defendant to jail. After arriving at the Grant County Jail, Bloyer booked defendant and requested that she fill out a domestic victim's worksheet. At no time did Bloyer inform defendant of her *Miranda* rights.

At the suppression hearing, defendant argued that since Bloyer failed to apprise her of her *Miranda* rights immediately after entering the trailer home and at the

Grant County Jail, the court should suppress her statements to Bloyer and her responses to the domestic victim's worksheet. Concluding that the questioning of defendant at her trailer home occurred during the "investigatory stage" of the arrest, the trial court refused to suppress defendant's statements to Bloyer. The trial court suppressed her responses to the domestic victim's worksheet, however, and the state does not appeal that part of the court's order.

At a jury trial, Bloyer recounted defendant's statements at the trailer home. The jury found defendant guilty of disorderly conduct, contrary to sec. 947.01, Stats., and the trial court entered a judgment of conviction.

## *MIRANDA* RIGHTS

■

Defendant contends the statements she made in her home are inadmissible because Bloyer failed to give her *Miranda* warnings. In *Miranda v. Arizona,* 384 U.S. 436 (1966), the Court concluded that where a defendant is subject to "custodial interrogation" certain procedural safeguards are necessary to protect his or her fifth and fourteenth amendment privilege against compulsory self-incrimination. *Rhode Island v. Innis,* 446 U.S. 291, 297 (1980). These procedural safeguards include the now famous *Miranda* warnings. Thus, if the police take a suspect into custody and ask him or her questions without giving *Miranda* warnings, the responses cannot be used as evidence to establish his or her guilt. *Berkemer v. McCarty,* 468 U.S. 420, 429 (1984).

■■

The *Miranda* Court stated that, "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into

custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444 (footnote omitted). Not every on-the-scene questioning by a police officer need be preceded by a *Miranda* warning. *Gelhaar v. State,* 58 Wis. 2d 547, 555, 207 N.W.2d 88, 93 (1973). When general on-the-scene questions are investigatory rather than accusatory in nature, the *Miranda* rule does not apply. *State v. Boggess,* 110 Wis. 2d 309, 317, 328 N.W.2d 878, 881 (Ct. App. 1982), *aff'd,* 115 Wis. 2d 443, 340 N.W.2d 516 (1983).

In *Miranda,* the court emphasized:

> Our decision is not intended to hamper the traditional function of police officers in investigating crime. *See Escobedo v. Illinois,* 378 U.S. 478, 492 . . .. *General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.* It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

*Id.* at 477–78 (emphasis added; footnote omitted). The ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest. *New York v. Quarles,* 467 U.S. 649, 655 (1984).

██ In making this determination, a court should consider the totality of the circumstances. *United States v. Hocking,* 860 F.2d 769, 773 (7th Cir. 1988). The defendant's freedom to leave the scene and the purpose, place and length of the interrogation are all relevant factors. *United States v. Helmel,* 769 F.2d 1306, 1320 (8th Cir. 1985). Because the facts in this case are undisputed, this

determination presents a question of law. *State v. Koput,* 142 Wis. 2d 370, 379, 418 N.W.2d 804, 808 (1988).

Having arrived at a scene of suspected domestic abuse, Bloyer was required pursuant to sec. 968.075(3)(a)1b., Stats., to determine which spouse was the primary physical aggressor. Section 968.075(3)(a)1b. provides, in part:

> When the officer has reasonable grounds to believe that spouses, former spouses or other persons who reside together or formerly resided together are committing or have committed domestic abuse against each other, the officer does not have to arrest both persons, but should arrest the person whom the officer believes to be the primary physical aggressor.

Questions aimed at arriving at this factual determination are investigatory. Their purpose is simply to ascertain *which* spouse is the primary physical aggressor.

The investigation was made in the absence of coercion or compulsion. *See Roney v. State,* 44 Wis. 2d 522, 531, 171 N.W.2d 400, 404-405 (1969). It occurred in defendant's home. While a person may be deemed to be in custody even in their own home, "such is not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *Helmel,* 769 F.2d at 1320.

In a similar case, *Gelhaar v. State,* 58 Wis. 2d 547, 207 N.W.2d 88 (1973), the defendant approached a police officer arriving at her home and exclaimed, referring to her husband, "I didn't mean to do it, I didn't mean to do it, I'll give him all my blood." *Id.* at 551, 207 N.W.2d at 91. A conversation between defendant and the police officer ensued, lasting over twenty minutes, at no time during which was defendant given her *Miranda*

rights. *Id.* at 551–52, 207 N.W.2d at 91–92. The court denied defendant's motion to suppress, stating:

> The trial court properly found that the atmosphere of a "custodial or in-station interrogation was totally absent." The defendant made her statements during her conversation with Officer Kedzierski during the period right after the stabbing when she talked with him at her home . . .. It is true that the statements were made at the end of a twenty-five minute period of "questioning." This length of time alone does not mean that the defendant was otherwise deprived of her freedom of action in any significant way.

*Id.* at 557, 207 N.W.2d at 94.

At no time during the conversation was defendant told that she was not free to leave, nor was her movement in any way restricted. Defendant relies on Bloyer's testimony that, had she asked to leave, he "would have asked her to stay." However, Bloyer's subjective intentions are not relevant to the determination of whether defendant was in custody. "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation." *Berkemer,* 468 U.S. at 442; *see Koput,* 142 Wis. 2d at 379, 418 N.W.2d at 808. A reasonable person, viewing the situation objectively, would not have concluded that their movement was restrained.

Because defendant was not deprived of her freedom nor was she questioned in a coercive environment, Bloyer was not required to recite *Miranda* warnings prior to questioning defendant in her home. The trial

court correctly concluded that these statements were admissible at trial.

*By the Court.*—Order and judgment affirmed.